UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

PERCY SHAW, et al.,

        Plaintiffs,

v.

LONDON CARRIER, INC., et al.,

        Defendants.

Case No. 1:08-cv-401

Honorable Janet T. Neff

**MEMORANDUM OPINION**

        This is a wrongful death action arising from a fatal traffic accident that occurred on October 15, 2007, in Calhoun County, resulting in the deaths of Porsha Shaw and Broderick Green and personal injuries to Percy Shaw. Plaintiffs are represented in this action by the law firm of Fieger, Fieger, Kenney, Johnson & Giroux, P.C. (the Fieger firm). Defendants in this action are London Carrier, Inc. (the owner of the tractor involved in the accident), Larry T. Shaw (the driver) and First Choice Carrier (the owner of the trailer attached to London Carrier's tractor). First Choice Carrier is represented by attorneys with the firm of Bowman & Brooke, LLP.

        The matter is before the court on the motion of First Choice Carrier (FCC) to disqualify the Fieger firm from further representation of plaintiffs in this matter. The ground for disqualification arises from the decision of Attorney Gregory Wix, who formerly represented FCC in this matter, to leave the Bowman & Brooke firm and join the Fieger firm in April 2009, during the pendency of this case. In a nutshell, FCC contends that the Fieger firm is disqualified under the imputed disqualification rule of Mich. R. Prof. Conduct 1.10(b). While admitting that it did not

comply with the requirements of Rule 1.10(b), the Fieger firm resists the motion to disqualify. District Judge Janet T. Neff has referred the motion to disqualify to me for decision pursuant to 28 U.S.C. § 636(b)(1)(A). I conducted a hearing on the motion on November 18, 2009. For the reasons set forth below, I find that the Fieger firm is clearly disqualified from further representing plaintiffs by the requirements of Mich. R. Prof. Conduct 1.10(b) and that the firm has failed in its burden to establish its eligibility for the exception to disqualification expressly provided in the rule. The motion to disqualify will therefore be granted.

**Findings of Fact**

The facts underlying the motion for disqualification are set forth in the record and are not subject to genuine dispute.

1. This action was commenced in the Calhoun County Circuit Court on February 1, 2008, by the filing of a complaint against London Carrier, Inc. Plaintiffs' complaint sought recovery for the wrongful deaths of Porsha Shaw and Broderick Green, and the personal injuries to Percy Shaw. Plaintiffs' complaint alleged that the negligence of Larry T. Shaw, the driver of the tractor-trailer, was the proximate cause of the accident (count I). The liability of London Carrier, Inc. was premised on the Michigan owner's liability statute (count II). The Fieger firm represented plaintiffs at the time of filing the complaint and continues to represent them to this date.

2. By notice of removal filed April 30, 2008, London Carrier, Inc. removed the matter to this court on the basis of complete diversity of citizenship and requisite amount in controversy. 28 U.S.C. § 1332(a). On December 1, 2008, plaintiffs filed a first amended complaint adding FCC as a party defendant. The first amended complaint (docket # 21) added a third count,

directed against FCC as the owner of the trailer being hauled by London Carrier's tractor at the time of the accident. Count 3 contains theories of active negligence against FCC. On January 13, 2009, appearances on behalf of FCC were filed by attorneys Ronald C. Wernette (docket # 34) and Gregory Wayne Wix (docket # 35), both of the firm of Bowman & Brooke, LLP.

        3.      On January 20, 2009, FCC filed its answer to the amended complaint (docket # 36) signed by Mr. Wix as one of the attorneys for FCC. Thereafter, Mr. Wix filed motions on behalf of FCC (*see* docket #'s 38, 40, 43), as well as other documents (*see* docket #'s 57, 58). In addition, it is undisputed that Mr. Wix personally dealt with written discovery, represented FCC at three depositions, and engaged in internal strategy discussions. As an associate in the Bowman & Brooke firm, Mr. Wix was under the direct supervision of attorney Ronald Wernette. Mr. Wernette and Mr. Wix were the only attorneys representing FCC in this matter.[1]

        4.      On April 20, 2009, Mr. Wix terminated his employment relationship with Bowman & Brooke, LLP, for the purpose of becoming associated with the Fieger firm. He was scheduled to begin employment at the Fieger firm on April 30, 2009. On April 24, 2009, Jeffrey Fieger circulated a memorandum to the firm announcing Mr. Wix's employment. The memorandum then addressed the firm's ethical obligations to insulate Mr. Wix from involvement with cases involving Bowman & Brooke:

> As part of our ethical responsibilities, will everyone in the firm please advise me of any present cases you may have with Bowman & Brooke. If there are any, there must not be any discussion of any kind with Greg concerning these cases, and he is to have no involvement whatsoever in any of those cases (including covering depositions). The legal term for insulting [sic] the case is called a "Chinese wall."

---

[1] In the related Wayne County Circuit Court action, *Cheryl Lewis Harris v. London Carrier, Inc., et al.*, case no. 08-113833-NI, which arises from the same traffic accident, Mr. Wix rendered similar legal services on behalf of FCC.

> It is absolutely unethical for Greg to have any contact with any pending cases involving Bowman & Brooke. I'm sure all of you will take proper precautions.

(Plf. Ex. A, docket # 72-3).

5. The Fieger firm took no immediate action to notify this court or any other tribunal of the conflict of interest created by the firm's hiring of Mr. Wix. Thomas Brannigan, managing partner of the Detroit office of the Bowman & Brooke firm, wrote Jeffrey Fieger on May 26, 2009, raising the issue of conflict of interest. Mr. Fieger acknowledged receipt of the letter in his responsive letter dated May 29, 2009. (FCC Ex. E, docket # 70-6). Mr. Fieger's letter stated: "I can assure you that we will comply with the rules as to notification to necessary tribunals."

6. Thereafter, the Fieger firm did not give any notice to this court, whether written or oral, regarding the conflict of interest caused by Mr. Wix's employment with that firm.

7. On October 2, 2009, FCC moved to disqualify the Fieger firm on the basis of the principles of imputed disqualification embodied in Rule 1.10(b) of the Michigan Rules of Professional Conduct. The Fieger firm responded to the motion on October 16, 2009. (Response, docket # 72). Attached to the response are the affidavits of Gregory Wix (Plf. Ex. B, docket # 72-4) and Thomas M. Lizza (the attorney from the Fieger firm with responsibility for the present case) (Plf. Ex. C, docket # 72-5). These affidavits disclose to the court for the first time that Mr. Wix had been screened from any connection with the instant case and that he has not had any conversation with any representative of the firm regarding the case, has not worked on the case, and will not share in any fees. This written notification was filed almost six months after Mr. Wix became employed by the Fieger firm.

**Discussion**

A motion to disqualify counsel is the proper method for a party to bring to the court's attention an alleged conflict of interest or breach of ethical duty by opposing counsel. *See DeBiasi v. Charter County of Wayne*, 284 F. Supp. 2d 760, 770 (E.D. Mich. 2003) (citing *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742 (5th Cir. 1980)). The power to disqualify an attorney from a case is "incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession." *S.D. Warren Co. v. Duff-Norton*, 302 F. Supp. 2d 762, 766 (W.D. Mich. 2004) (quoting *Ex Parte Burr*, 22 U.S. (9 Wheat) 529, 531 (1824)). A violation of the rules of professional ethics, however, does not automatically necessitate disqualification of an attorney. *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002). While motions to disqualify are legitimate and necessary to protect the integrity of judicial proceedings and the ethics of the bar, courts must be vigilant in reviewing motions to disqualify counsel, as the "ability to deny one's opponent the services of capable counsel is a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988). The court must therefore balance the interest of the court and the public in upholding the integrity of the legal profession against the right of a party to retain counsel of its choice. *Id.* at 225. A decision to disqualify counsel must be based on a factual inquiry conducted in a manner allowing appellate review. *General Mill Supply Co. v. SCA Servs.*, 697 F.2d 704, 710 (6th Cir. 1982). The Sixth Circuit will review this court's decision on motion to disqualify for an abuse of discretion. *See Moses v. Sterling Commerce (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005). This standard of review is a "generous one" and district courts are given "wide latitude" in making such determinations. *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008).

Ethical rules involving attorneys practicing in the federal courts are ultimately questions of federal law. The federal courts, however, are entitled to look to the state rules of professional conduct for guidance. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985). Although the Sixth Circuit formerly applied common-law principles to resolve issues of disqualification, that court now indicates that it will rely on the applicable state ethical codes, for reasons of greater uniformity and predictability. *National Union Fire Ins. Co. v. Pittsburgh, Pa. v. Alticor, Inc.*, 466 F.3d 456, 457-58 (6th Cir. 2006), *vacated in part on other grounds*, 472 F.3d 436 (6th Cir. 2007) (applying Michigan Rules of Professional Conduct). The district judges of this court have determined that the ethical obligations of attorneys practicing before it will generally be governed by Michigan Rules of Professional Responsibility. *See* W.D. MICH. LCIVR 83.1(j); *City of Kalamazoo v. Michigan Disposal Serv. Corp.*, 125 F. Supp. 2d 219, 231 (W.D. Mich. 2000).

### 1. Disqualification of Mr. Wix

Attorney Gregory Wix is disqualified from representing plaintiffs in this action by the clear provisions of Mich. R. Prof. Cond. 1.9(a) That rule provides as follows:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

MICH. R. PROF. COND. 1.9(a). This rule is designed to preserve an attorney's fundamental duty of undivided loyalty to clients, as well as to preserve client confidences. As Mr. Wix was counsel of record for FCC in the present case, he is clearly barred from representing plaintiffs in the very same action, in the absence of consent.

## 2. Imputed Disqualification of the Fieger Firm

Mr. Wix's association with the Fieger firm as of April 30, 2009, made the firm subject to the imputed disqualification rule embodied in Mich. R. Prof. Cond. 1.10. That rule provides in relevant part as follows:

**Rule 1.10 Imputed Disqualification:  General Rule**

(a)  While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9(a) or (c), or 2.2.  If a lawyer leaves a firm and becomes associated with another firm, MRPC 1.10(b) governs whether the new firm is imputedly disqualified because of the newly hired lawyer's prior services in or association with the lawyer's former law firm.

(b)  When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, is disqualified under Rule 1.9(b), unless:

(1)  the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2)  written notice is promptly given to the appropriate tribunal to enable it to ascertain compliance with the provisions of this rule.

MICH. R. PROF. COND. 1.10(a), (b).  Rule 1.10 codifies the common-law rule on imputed disqualification.  At common law, where a lawyer privy to confidential information received from a former client becomes associated with a firm with an adverse interest to the former client in the same or a substantially related matter, a presumption arises that client confidences have been shared. *See Manning*, 849 F.2d at 225.  The presumption, however, is rebuttable on a case-by-case basis. *Id.* at 225-26.

The Michigan rule follows this schema. Under Mich. R. Prof. Cond. 1.10(b), the association of Mr. Wix with the Fieger firm created a rebuttable presumption of shared confidences, such that the Fieger firm "may not knowingly represent a person in the same or a substantially related matter . . .", unless the firm bears the burden of showing *both* that the disqualified lawyer was screened from any participation in the matter and receives no part of the fee *and* written notice has promptly been given to the appropriate tribunal to enable it to ascertain compliance with the provisions of the rule. It is important to note that the Michigan rule differs in a significant way from the model rule promulgated by the ABA. Under Model Rule 1.10, a law firm rebuts the presumption of shared confidences by giving notice to the *former client*:

> (i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom;
>
> (ii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures; and
>
> (iii) certifications of compliance with these Rules and with the screening procedures are provided to the former client by the screened lawyer and by a partner of the firm, at reasonable intervals upon the former client's written request and upon termination of the screening procedures.

ABA MODEL RULES OF PROF'L CONDUCT R. 1.10(a)(2). Obviously, the Michigan Supreme Court was not satisfied with notice to the former client, but envisioned an active role for the "appropriate" trial or appellate "tribunal" in policing conflicts of interest and in assuring itself (and presumably the nervous former client) that the lawyer's new firm will conduct itself in strict accordance with the ethical rules.

In the present case, the affidavits of Messrs. Lizza and Wix are sufficient to show compliance with the requirements of Michigan Rule 1.10(b)(1). It appears that Mr. Wix was indeed screened from participation in this matter and that he will not receive any part of the fee. It is likewise undisputed that written notice was not promptly given to this court to enable it to exercise its oversight, as required by Rule 1.10(b)(2). The only remaining issue is whether the requirements of Rule 1.10(b)(2) can somehow be ignored or overlooked in the circumstances of this case.

### 3. Can Subsection (2) Be Ignored?

The Fieger firm has not cited any authority that would allow this court to write the requirements of subsection (2) out of the ethical rule. Decisions from both the Sixth Circuit Court of Appeals and the Eastern District militate towards the contrary result: compliance with both subsections of Rule 1.10(b) is necessary for a law firm to rebut successfully the presumption of shared confidences.

The two most important decisions are from the United States Court of Appeals for the Sixth Circuit, both rendered in the same case. In *National Union Fire Insurance Co. of Pittsburgh v. Alticor*, 466 F.3d 456 (6th Cir. 2006), the court faced a disqualification motion arising from facts indistinguishable from the present case. In *National Union*, attorney John Egan was employed by National Union's law firm, Plunkett & Cooney, for a three-year period, during which he represented National Union in cases involving defendant Alticor, including the very case then before the Court of Appeals. Like Mr. Wix, Egan drafted pleadings and motions, represented the insurance company in discovery, and engaged in strategy sessions. Egan left the employ of Plunkett and immediately became associated with the defendant's law firm during the time the case was

pending in the Court of Appeals. National Union moved to disqualify plaintiff's law firm from representing Alticor on a theory of imputed disqualification. 466 F.3d at 457.

The Court of Appeals relied on the Michigan Rules of Professional Conduct, specifically Mich. R. Prof. Cond. 1.9 and 1.10. The court found that Egan was clearly disqualified by Rule 1.9(a), as he had represented National Union in the same litigation. The court then applied Rule 1.10(a), which provides that when lawyers are associated in a firm, "none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so" by certain rules, including Rule 1.9(a). The Court of Appeals found that the plaintiff's firm could not avoid imputed disqualification by screening Egan from the matter. 466 F.3d at 459.

In response to the *National Union* case, the Michigan Supreme Court amended Mich. R. Prof. Cond. 1.10(a) to add the following sentence: "If a lawyer leaves a firm and becomes associated with another firm, MRPC 1.10(b) governs whether the new firm is imputedly disqualified because of the newly hired lawyer's prior services in or association with the lawyer's former law firm." The Court of Appeals granted plaintiff's motion for rehearing on the basis of a change in law, acknowledging that the state Supreme Court's amendment of the Rules of Professional Conduct required the application not of Rule 1.10(a), but of Rule 1.10(b), under which disqualification could be avoided by screening and prompt written notice to the appropriate tribunal. *National Union Fire Ins. Co. v. Pittsburgh v. Alticor*, 472 F.3d 436 (6th Cir. 2007). The Court of Appeals found, however, that plaintiff's attorney "never notified this court in writing of attorney John Egan's change in employment and formal representation of National Union as required by MRPC 1.10(b)(2). That failure requires Wilson's disqualification." 472 F.3d at 439. The court cited a decision of the Michigan Court of Appeals, *Town & Country Apartments v. City of Wixom*, No. 238471, 2003 WL

1861113 (Mich. Ct. App. Apr. 8, 2003), upholding a disqualification because, among other reasons, there was no evidence that the "infected" law firm provided written notice to the tribunal concerning the issue of a conflict of interest as required by Rule 1.10(b)(2). It is clear from the second *National Union* decision that the only reason that the Sixth Circuit disqualified counsel was the failure to give prompt written notice as required by Rule 1.10(b).

The *National Union* case relied on Judge Paul D. Borman's published decision in *Cobb Publishing, Inc. v. Hearst Corp.*, 891 F. Supp. 388 (E.D. Mich. 1995). *Cobb* involved an attorney's migration from the law firm representing plaintiff to the law firm representing defendants during the course of the litigation, where the attorney had worked extensively on plaintiff's case before changing firms. In a previous ruling, Judge Borman found that defense counsel violated Rule 1.10(b) by failing to timely implement a comprehensive screening procedure until nine days after the new associate's employment with the firm. The court further concluded that the firm violated Rule 1.10(b)(2) by failing to provide the required prompt written notice of the associate's hiring to the court for a two-week period. The defense firm then moved for reconsideration arguing, among other issues, that its violation of the requirements of subsection (b)(2) should be ignored, because there was no evidence that the associate had disclosed any confidence. Like the Fieger firm's position in the present case, defense counsel's position was "No Harm No Foul." 891 F. Supp. at 391. Judge Borman noted that the core issue was not whether confidences in fact had been breached, but whether the infected law firm could successfully rebut the presumption of shared confidences. *Id.* The court pointedly rejected the argument, which the Fieger firm makes in the present case, that the requirement of a timely notification to the court may be ignored, as long as the infected firm can show that no confidences were actually breached:

>In essence, MC contends that, whenever a Motion for Disqualification is brought, if the hiring firm can establish that there is no evidence of any confidences disclosed up to that time, and can point to a screen or Chinese Wall for the future, the inquiry must be resolved against disqualification. Carrying this argument to its logical extreme, if no motion for disqualification is filed until 6 months, or indeed "whenever" after the "infected" attorney joins the new firm, and the new firm did not establish a comprehensive screen and even ignored notice of the conflict, and that new firm presents evidence through its attorneys that no confidences were shown to have been disclosed, and further evidences that a comprehensive firm-wall screen is now being established for the future, then the Court must deny disqualification.

891 F. Supp. at 393. The court remarked that under both common law and the Michigan Rules, timely compliance with notification rules is of the essence:

>It is understandable why a legal system, which is willing to rely on the good faith statements of "righteousness" by the adversary lawyers, who have just been involved in terminating the complainant's primary lawyer-client relationship, should demand more effective protective procedures than "nothing happened" affidavits. This is why the legal profession requires timely screens/walls to protect client confidences. The words "timely" in *Manning*, and "promptly" in MRPC 1.10(b)(2) are not mere surplusage, but essential to the procedure involved. Requiring "timely "screens and "prompt" notice provides the greatest potential for protecting the confidences of the spurned client, and indicates to that client and to the public that the legal profession is responsive to the confidences of the clients that it serves.

*Id.* Judge Borman noted that any contrary holding would eliminate any meaningful role for the judiciary, placing into the hands of the "infected" attorney and the firm that hired him away control of the ethical issue. On this basis, Judge Borman refused to disturb his order of disqualification.

Also relevant is the decision of Judge John Corbett O'Meara in *Faith Baptist Church v. Waterford Twp.*, No. 08-11028, 2009 WL 3756891 (E.D. Mich. Nov. 6, 2009), decided only three weeks ago. *Faith Baptist* was a section 1983 case brought against Waterford Township. The primary attorney for plaintiffs was Brandon Bolling who, in the midst of this litigation, was offered a job by defendant's law firm. Bolling moved to withdraw from the case on May 21, 2009, but did not inform the court in writing that his new employer was representing the defendant. Although

Bolling and his new firm asserted that the appropriate screening mechanisms had been put into place, it was undisputed that Bolling did not provide the court with a written notice until August 28, 2009, approximately three months later.

Judge O'Meara found that the infected firm had complied with Mich. R. Prof. Cond. 1.10(b)(1), in that Bolling had been screened from participation in the litigation when his employment with the new firm began. 2009 WL 3756891, at * 1. The court found, however, that neither Bolling nor anyone else at his new firm provided prompt written notice to the court of the conflict. Relying on *Alticor* and *Cobb*, Judge O'Meara found that "prompt (essentially immediate) written notice to the court is required." *Id.* at 2. On that basis, the court disqualified defense counsel, even in the absence of any evidence of the actual sharing of confidences.

The four cases cited above -- one from the Sixth Circuit, two from the Eastern District, and one from the Michigan Court of Appeals -- all stand for the proposition that prompt written notice of a conflict to the tribunal is an essential safeguard of client confidences and compliance by an infected firm is necessary to rebut the presumption in favor of disqualification. Plaintiffs have cited no case taking a different position. Disqualification is clearly not automatic. The infected law firm has in its power clear and straightforward means to rebut the presumption and avoid disqualification: erection of an appropriate screen and prompt notice to the court.

In the present case, the Fieger firm was required, in the words of Judge O'Meara, to give this court "almost immediate" notice that Mr. Wix had changed law firms effective April 30, 2009. By the end of May 2009, the Fieger firm had not done so. Bowman & Brooke provided the Fieger firm with the courtesy of a notice, by letter dated May 26, 2009, concerning the firm's ethical obligations. Arguably, by this time it was already too late, as the *Cobb* case holds that a two-week

delay can be excessive. Nevertheless, the managing partner of the Fieger firm acknowledged the letter and assured counsel that "we will comply with the rules as to notification to necessary tribunals." (Def. Ex. E). Notwithstanding this commitment, the Fieger firm did nothing until defense counsel raised the issue in October 2009. In these circumstances, the Fieger firm has clearly failed to rebut the presumption of shared confidences in the manner required by Rule 1.10(b).

Only two issues remain. First, plaintiffs argue that the motion to disqualify is merely a tactic, designed to deprive plaintiffs of counsel of their choice. Although the court must be vigilant to prevent gamesmanship in the disqualification context, no such occasion is presented here. Defense counsel was up front with the Fieger firm in raising the issue on an early basis, giving the firm an opportunity to discharge its ethical obligations. Defense counsel cannot be faulted for waiting several months thereafter to move for disqualification, thereby giving the Fieger firm a chance to accomplish what the rules require. As Judge Borman has noted, the obligation to comply with the ethical rules is squarely on the infected firm, not on the opponent. *Cobb*, 891 F. Supp. at 393-94. FCC can therefore not be charged with gamesmanship in these proceedings, nor is it guilty of some sort of waiver in allowing reasonable time for the Fieger firm to abide by its ethical obligations. By hiring Mr. Wix, the Fieger firm inherited his obligation to safeguard client confidences from FCC. That burden never shifted from the lawyer to the client. *Id.*

Finally, at oral argument, plaintiffs' counsel suggested that any disqualification would only disable the Fieger firm from opposing FCC in this case, but that it could remain plaintiffs' counsel in the case against London Carrier, Inc. and the driver Larry Shaw. This argument, never raised in the briefs, ignores the language of the rule and common sense. Mich. R. Prof. Cond. 1.10(b) provides that the Fieger firm "may not knowingly represent a person in the same or a

substantially related matter in which [Mr. Wix] is disqualified." The disqualification applies to the "matter," not only to a limited part of the case. By the clear language of the rule, the Fieger firm is disqualified from this "matter." Furthermore, the case against London Carrier and FCC arises from a single automobile accident. London Carrier owned the tractor, and FCC owned the trailer. This case presents a single cause of action, and it would be impossible for the court to police the situation in which the Fieger firm would represent plaintiffs against the owners of the tractor while another firm stood in with regard to claims against the trailer. This "matter" cannot practically be subdivided into mini-cases for purposes of complying with the ethical rules.

        The imputed disqualification rules do not set forth some sort of legal technicality that can be dispensed with at a court's whim. Rather, they are designed to safeguard the integrity of the legal profession and public confidence in lawyers. A client such as FCC who finds itself opposed by a law firm that has just hired one of the client's main lawyers has every reason for apprehension. The ethical rules recognize this and provide for the disqualification of the firm that precipitated this unseemly situation, unless the firm complies with the screening and notice provisions necessary for the court to assure ethical conduct by the attorneys appearing before it. A law firm that fails to discharge its clear obligation under the imputed disqualification rules puts the court in the awkward position of telling clients that ethical rules do not really matter and that the court takes lightly its obligation to assure ethical conduct.

        For the foregoing reasons, the motion to disqualify the Fieger firm will be granted.

Dated: November 24, 2009        /s/ Joseph G. Scoville
        United States Magistrate Judge